❐ Original    ❐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched or identify the person by name and address)* <br> 3304A North 12th Street, Milwaukee, WI (Target Location), as further described in Attachment A | ) ) ) ) ) ) )    Case No.   26-920M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before   May 6, 2026 _____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*    ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      4/22/2026 @ 9:46 a.m. _____

*Judge's signature*

City and state:   Milwaukee, WI _____          Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**PLACE TO BE SEARCHED**

**3304A North 12th Street, Milwaukee, Wisconsin ("Target Location")** including to include any common or storage areas, and a Land Rover, bearing Wisconsin license plate AWN4119 (Land Rover) as further described in A. **Target Location** is a residence in which Laura KNEZIC is associated with and was arrested at on April 22, 2026. **Target Location** is a two-story, multi-family residence located on the east side of N. 12th Street. The exterior is described as having white siding with black trim and a gray-shingled rooftop. The primary entry door to 3304A is located on the east side (rear) of the building and consists of a black metal exterior door and an off-white interior door with three decorative windows. The numbers "3304A" are affixed in a horizontal fashion to the south of this east-facing entry door to 3304A, in black numerals on a white background. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are seeking authorization to search **Target Location** as well as any common or storage areas because case agents believe that Del Portillo has access to the entire residence. **Target Location** is depicted below in Figures 1, 2 and 3.



Figure 1



Figure 2



Figure 3

## ATTACHMENT B

### ITEMS TO BE SEIZED

1.      All records, information, and items relating to violations of distribution and possession with intent to distribute controlled substances,  conspiracy to distribute and possess with the intent to distribute controlled substances, and possession of a firearm in furtherance of a drug-trafficking offense, violations of Title 18, United States Code Sections 924(c) and 2(a); Title 21, United States Code Sections 841(a)(1), and  846, have been committed by Laura Knezic, and others (Target Subject), and occurring between March, 2025 to present, including:

    a. Controlled substances;

    b. Evidence of the crimes described above;

    c. Evidence of preparatory steps taken in furtherance of those crimes under investigation;

    d. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

    e. Evidence of motive, intent, or knowledge of the crime described above;

    f. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

    g. Bank records, checks, credit card bills, checking and saving account information, and other financial records;

    h. Lists of drug customers and related identifying information;

    i. Documents and records identifying types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

    j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    k. Indicia of residency;

    l. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

    m. U.S. Currency;

n.  Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation;

o.  Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

p.  Cellular telephones, computers, and electronic storage media (hereinafter DEVICE), and all electronic storage areas on such DEVICES including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data;

q.  Evidence of the location, whereabouts, and patterns of travel of Target Subjects; and

r.  Evidence about the appearance, clothing, and identity of Target Subjects.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the location described in Attachment A1, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of the Target Subjects to the fingerprint sensor ("Touch ID") and (2) to present the face of the Target Subjects to the facial recognition sensor, such as a camera, ("Face ID") of the devices found at the location for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

Note:  The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers.  If occupants of the

premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3304A North 12th Street, Milwaukee, WI (Target<br>Location), as further described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   26-920M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846; 18 U.S.C. § 924(c) | Possession with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Possession of a Firearm in Furtherance of Drug Trafficking |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEREMY S DORN    Digitally signed by JEREMY S DORN
Date: 2026.04.22 06:44:47 -05'00'

*Applicant's signature*

Jeremy Dorn, SA HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:   4/22/2026

*Judge's signature*

City and state:   Milwaukee, WI     Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT**</u>
<u>**SEARCH AND SEIZURE WARRANTS**</u>

I, Jeremy Dorn, Special Agent with the Homeland Security Investigations (HSI), being duly sworn, depose and state:

**I. INTRODUCTION AND AFFIANT'S BACKGROUND**

1. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a federal law enforcement agent for over ten years.

2. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal narcotics laws. I am currently a member of the Homeland Security Task Force as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have participated in drug trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other

controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. I have also been the affiant of search warrants.

3. I investigate criminal violations of the Federal laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957 and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

4. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

5. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

6. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, businesses

their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of drug trafficking.

7. Through training, experience, and discussions with other experienced agents:

a. I have learned about how individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain, on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is

Case 2:26-mj-00920-NJ    Filed 04/22/26    Page 11 of 33    Document 1

completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

o. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

9. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that

often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

10. This affidavit is submitted in support of an application for a search and seizure warrants for property described in Attachment A, for violations of federal law, including the Possession with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Possession of a Firearm in Furtherance of Drug Trafficking, violation of Title 21 U.S.C. §§ 841(a)(1) and 846; and 18 U.S.C. § 924(c) and 2(a) (Target Offenses).

11. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

12. Information within this affidavit comes from the following sources and criminal indices: observations made during physical and electronic surveillance, analysis of phone tolls, the installation of pen register/trap and trace devices, interviews conducted with reliable confidential source(s) (CS), information obtained from other law enforcement officers, controlled evidence purchases, location data for cellphones, subpoenaed records, recorded calls from the Wisconsin prison system and local jails, information gathered via consent recordings, and Title III interceptions over TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3.

13. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred, to establish the basis for seizure of funds that were involved in, or are traceable to funds involved in, money laundering transactions, and to establish that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

14. For the reasons discussed herein, there is probable cause to believe that evidence of the above-referenced Target Offenses will be located at, and in the Target Location, more fully described in Attachment A.

## II. PURPOSE OF AFFIDAVIT

**Property for Which Search Warrant Sought.**

Page 7

15.     For the reasons discussed herein, there is probable cause to believe that located at and in the following property, more fully described in Attachment A ,are items that constitute evidence of the Target Offenses.

| Address | Target Locations | Associated Target Subjects |
|---|---|---|
| 3304A North 12th Street Milwaukee, Wisconsin | **Target Location** | Laura KNEZIC |

a. **3304A North 12th Street, Milwaukee, Wisconsin ("Target Location")** including to include any common or storage areas, and a Land Rover, bearing Wisconsin license plate AWN4119 (Land Rover) as further described in A. **Target Location** is a residence in which Laura KNEZIC is associated with and was arrested at on April 22, 2026. **Target Location** is a two-story, multi-family residence located on the east side of N. 12th Street. The exterior is described as having white siding with black trim and a gray-shingled rooftop. The primary entry door to 3304A is located on the east side (rear) of the building and consists of a black metal exterior door and an off-white interior door with three decorative windows. The numbers "3304A" are affixed in a horizontal fashion to the south of this east-facing entry door to 3304A, in black numerals on a white background. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are seeking authorization to search **Target Location** as well as any common or storage areas because case agents believe that Del Portillo has access to the entire residence. **Target Location** is depicted below in Figures 1, 2 and 3.



Figure 1



Figure 2



Figure 3

## II.      <u>PROBABLE CAUSE</u>

16.    Since approximately May 2024, HSI, Drug Enforcement Administration (DEA), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), West Allis Police Department (WAPD) and other local agencies have been investigating several related drug trafficking organizations (DTOs) on the southside of Milwaukee, Wisconsin that distribute fentanyl and cocaine. The DTOs are connected because they operate by renting properties from S2 Real Estate properties, with the express acquiescence and assistance of S2 Real Estate's owner, Sam STAIR and STAIR's employees.  As detailed below, STAIR and his employees, including LOPEZ affirmatively seek out drug traffickers to rent them S2 Real Estate properties[1]. STAIR, and his employees rent properties specifically to drug traffickers to generate additional rental income knowing that the DTOs renting S2 Real Estate properties are engaged in drug trafficking. The DTOs pay STAIR for the properties and his assistance in evading law enforcement detection and STAIR deposits the proceeds of his unlawful drug-trafficking enterprise into bank accounts he controls. STAIR also deposits his legitimate rental income into those accounts, thereby co-mingling legitimate income with proceeds of drug trafficking in an effort to conceal the source and nature of his drug-trafficking activity.

17.    Through the course of the investigation, case agents identified at least three DTOs working with STAIR including MCDADE DTO, LOCKETT DTO, and SINCLAIR DTO.  Laura KNEZIC has been identified as a member of the MCDADE DTO

18.    As part of the investigation, case agents have reviewed numerous recorded jail and prison calls, conducted electronic and physical surveillance, engaged in undercover

---

[1] As demonstrated by STAIRS social media on August 6, 2025, "the neighborhood drug dealer appreciates all the small bills you give to the corner beggers, so he can pay rent."

operations, conducted controlled buys and payments, reviewed court authorized wire and electronic intercepts, and other investigative tools.

19. **Laura F. KNEZIC** (hereinafter "KNEZIC"). As recounted in more detail herein, Laura KNEZIC works for the MCDADE DTO. On March 19, 2025, KNEZIC was arrested in a hotel room where she was found with Walter RINGERSMA and over 2,000 grams of cocaine. KNEZIC distributes controlled substances procured by MCDADE on behalf of the MCDADE DTO. KNEZIC has prior convictions of Carrying a Concealed Weapon (Date of Conviction: 11/22/2006); and Possession of THC (Date of Conviction: 5/4/2007). KNEZIC also has a pending criminal case, Milwaukee County Case 2025CF1435, Possession with Intent-Cocaine.

### A. Prior Arrest with Kilograms of Cocaine

20. On March 19, 2025 KNEZIC was arrested after law enforcement located over 2 kilograms of cocaine in a hotel room connected to her in Milwaukee, Wisconsin. KNEZIC was operating the Rover during her arrest. Also located inside the Rover of suspected marijuana and a digital scale. KNEZNIC was charged in state court for her drug possession and is currently on bail, Milwaukee County Case No. 2025CF1435

### B. Prior Surveillance

21. On October 2, 2025, case agents reviewed call detail records and observed there was phone contact taking place between STAIR and MCDADE's phones. At 5:31 p.m., MCDADE's personal line (414) 243-1392 placed an outgoing call to STAIR at TARGET TELEPHONE 1 that was 30 seconds long.

22. At 5:40 p.m., on October 2, 2025, MCDADE's personal line (414) 243-1392 was communicating with towers in the immediate area of S2 Real Estate at 2929 W. Lincoln

Avenue. The ping had an 88-meter ping radius. Attached is the map of that phone location (Figure 9).



(Figure 9)

23.     Case agents reviewed pole camera near S2 Real Estate, which captured that at approximately 5:39 p.m., a Land Rover, bearing Wisconsin license plate AWN4119 (Land Rover) pulled up to the side parking lot at S2 Real Estate. This occurred within approximately one minute of MCDADE's personal line (414) 243-1392 pinging in the immediate area of S2 Real Estate. Case agents reviewed MPD Report C2503190132 which established that the registered owner of the Land Rover was the mother of Laura KNEZIC.

24.     The Land Rover remained on and parked for a few minutes. At 5:42 p.m., a white female, identified by case agents as KNEZIC, exited the driver door of the Land Rover and a black male exited the passenger door.  KNEZIC and the male walked to the front door of S2. Based on my training, experience, and investigation into the TCO, including extensive surveillance, I believe the black male was MCDADE, even though the pole camera did not capture the male's face.  Case agents observed through call detail records that at 5:43 p.m. MCDADE's personal line (414) 243-1392 placed an outgoing call to STAIR's telephone number 414-732-3682 (TARGET TELEPHONE 1) that lasted 39 seconds.

25. At 5:44 p.m., the rear pole camera behind S2 Real Estate captured STAIR exit the rear side door of business and walk up to the front, wave down the subject believed to be MCDADE and KNEZIC. STAIR then walked the male believed to be MCDADE and KNEZIC towards the back door where they all entered the business. The male believed to be MCDADE appeared to have nothing in his hand at the time he entered the business.

26. At 5:48 p.m., case agents observed on the pole camera that KNEZIC, the male believed to be MCDADE, and STAIR exited S2 Real Estate. The male believed to be MCDADE had a black object that looked like a bag in his left hand. KNEZIC, the male believed to be MCDADE, and STAIR appeared to talk and then STAIR entered the Tesla. KNEZIC and the male believed to be MCDADE entered the Land Rover and left. Immediately after this meeting, case agents observed STAIR travel to the Tri-City Bank to make a deposit.

27. Based on my training, experience, and investigation into the MCDADE DTO, I believe this interaction between STAIR, MCDADE, and KNEZIC was consistent with a drug transaction, likely MCDADE and KNEZIC picking up controlled substances or a large amount of drug proceeds from STAIR. Further, this would also be consistent with STAIR proceeding to the bank following this interaction to deposit drug proceeds into this account.

**C.     Arrest at Target Location**

28. On April 21, 2026, Magistrate Judge Nancy Joseph issued an arrest warrant for Laura KNEZIC in relation to a criminal complaint for violations of violations Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1) and 846.

29. On April 22, 2026, United States Marshals Service located KNEZIC at the **Target Location** and executed the arrest warrant. While executing the arrest warrant Marshals observed in plain view, a firearms, a small bag a substance, that based on training and experience is

consistent with marijuana, and a digital scale. Based on the investigation into KNEZIC and the MCDADE DTO, case agents believe these items are consistent with armed drug trafficking.

30. Case agents are now seeking authorization to search **Target Location.**

31. Based on my training and experience in drug investigations, I know that people engaged in the trafficking of controlled substances often store their controlled substances at their residences, their associate's residence, in the residences of co-conspirators, or other locations under the trafficker's control, for several reasons including (1) by storing controlled substances at the trafficker's residence or other properties under their control, the trafficker maintains proximity and access to the controlled substances allowing them to quickly restock, package, and distribute their controlled substances; (2) a trafficker's residence (or other property under their control) provides security and privacy from public view allowing the trafficker to go undetected by concerned citizens and law enforcement; and (3) storing controlled substances, cash proceeds, and operational tools like ledgers and cell phones at their residence (or other locations under their control) allows drug traffickers to use their residences/properties as an efficient command center.

<u>**Vehicles, Basements and Outbuildings**</u>

32. I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence; that through personal training and experience in investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and

Page 14

other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements. I also know that people involved in drug trafficking often conceal evidence of their crimes including electronic devices such as cellular telephones on their persons.

### Computers, Electronic Storage and Forensic Analysis

33. As described above and in the Attachment B, this application seeks permission to search for records that might be found on **Target Locations,** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on **Target Locations**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before

Page 15

they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. *Forensic evidence.* As further described in Attachment Bs, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in **Target Locations** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove

Page 16

each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are

necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

36. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**BIOMETRIC UNLOCK**

38. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris

characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

(A) I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

(B) If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

(C) If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

(D) If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

39. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

Page 20

40. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

41. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

42. Due to the foregoing, with respect to KNEZIC located in **Target Locations** during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for

Page 21

the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant

## CONCLUSION

43.     Based on the above information, I respectfully submit that there is probable cause to believe that for violations of federal law, including the  Possession with Intent to Distribute; Conspiracy to Distribute Controlled Substances; Possession of a Firearm in Furtherance of Drug Trafficking, violation of  Title 21 U.S.C. §§ 841(a)(1) and 846; and 18 U.S.C. § 924(c) and 2(a) (Target Offenses), have been committed, and that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachments B, will be found within the **Target Location**, as further described in Attachments A. I therefore respectfully request that this Court issue a search warrant for the **Target Location** more particularly described in Attachments A, authorizing the seizure of the items described in the corresponding Attachment B.

44.     Case agents believe there are currently documents and records showing dominion and control of the **Target Location** cellular telephones, electronic devices, and other computers, and other evidence evincing the Target Subjects' involvement in the drug trafficking offenses described above, located within the **Target Location**, more particularly described in Attachment A, authorizing the seizure of the items described in the corresponding Attachment B.

## ATTACHMENT A

## PLACE TO BE SEARCHED

**3304A North 12ᵗʰ Street, Milwaukee, Wisconsin ("Target Location")** including to include any common or storage areas, and a Land Rover, bearing Wisconsin license plate AWN4119 (Land Rover) as further described in A. **Target Location** is a residence in which Laura KNEZIC is associated with and was arrested at on April 22, 2026. **Target Location** is a two-story, multi-family residence located on the east side of N. 12ᵗʰ Street. The exterior is described as having white siding with black trim and a gray-shingled rooftop. The primary entry door to 3304A is located on the east side (rear) of the building and consists of a black metal exterior door and an off-white interior door with three decorative windows. The numbers "3304A" are affixed in a horizontal fashion to the south of this east-facing entry door to 3304A, in black numerals on a white background. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are seeking authorization to search **Target Location** as well as any common or storage areas because case agents believe that Del Portillo has access to the entire residence. **Target Location** is depicted below in Figures 1, 2 and 3.



Figure 1



Figure 2



Figure 3

# ATTACHMENT B

## ITEMS TO BE SEIZED

1.    All records, information, and items relating to violations of distribution and possession with intent to distribute controlled substances,  conspiracy to distribute and possess with the intent to distribute controlled substances, and possession of a firearm in furtherance of a drug-trafficking offense, violations of Title 18, United States Code Sections 924(c) and 2(a); Title 21, United States Code Sections 841(a)(1), and  846, have been committed by Laura Knezic, and others (Target Subject), and occurring between March, 2025 to present, including:

a.  Controlled substances;

b.  Evidence of the crimes described above;

c.  Evidence of preparatory steps taken in furtherance of those crimes under investigation;

d.  Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

e.  Evidence of motive, intent, or knowledge of the crime described above;

f.  Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

g.  Bank records, checks, credit card bills, checking and saving account information, and other financial records;

h.  Lists of drug customers and related identifying information;

i.  Documents and records identifying types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

j.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

k.  Indicia of residency;

l.  Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

m.  U.S. Currency;

n. Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation;

o. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

p. Cellular telephones, computers, and electronic storage media (hereinafter DEVICE), and all electronic storage areas on such DEVICES including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data;

q. Evidence of the location, whereabouts, and patterns of travel of Target Subjects; and

r. Evidence about the appearance, clothing, and identity of Target Subjects.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the location described in Attachment A1, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of the Target Subjects to the fingerprint sensor ("Touch ID") and (2) to present the face of the Target Subjects to the facial recognition sensor, such as a camera, ("Face ID") of the devices found at the location for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

Note: The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers. If occupants of the

premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.